IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

CAMELBACK PROPERTIES, TERRY )
WILBOURN, and JAMES LANTZ, )
                                                           )    Case No. 10 C 01467
                   Plaintiffs, )
                                                           )    Magistrate Judge
          vs.                                             )    P. Michael Mahoney
                                                         )
PHOENIX INSURANCE COMPANY, a )
TRAVELERS COMPANY, )
                                                         )
                  Defendant. )

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

Plaintiffs originally filed this case in state court seeking a declaratory judgment that Plaintiffs' loss is a covered loss under the policy of insurance issued by Defendant. Defendant removed the case to the Eastern Division of the Northern District of Illinois on March 5, 2010, and it was subsequently transferred to Western Division on March 9, 2010. The court denied Plaintiffs' motion to remand the case back to state court on June 15, 2010, finding there to be complete diversity among the parties. The parties proceeded with discovery and filed cross-motions for summary judgment now before the court.

**II. BACKGROUND**

Plaintiff Camelback Properties ("Camelback") is an Illinois corporation engaged in the purchasing, constructing, remodeling, property management, maintaining, renting, and selling of several real estate properties. Plaintiffs, Terry Wilbourn ("Wilbourn") and James Lantz

("Lantz"), are partners in Camelback. Camelback owns a number of properties, including an office building (hereinafter referred to as "the Property") containing multiple units and common areas that is the subject of the parties' motions. At all times relevant to this case, the Property was insured through a policy issued by Defendant.

On December 19, 2008, the Property sustained water damage (hereinafter referred to as "the loss") as a result of a broken pipe. Defendants believe the damage to the pipe was caused by the pipe freezing. Plaintiffs maintain that the cause of the break is unknown. Plaintiffs reported the loss to their insurance broker, McHenry Insurance Services, on December 22, 2008 and also directly to an Outside Claim Representative for Travelers, Michelle Taylor ("Taylor"), on December 30, 2008. Taylor inspected the property and conducted an additional background investigation regarding the loss. Taylor determined that all units at the Property were vacant between September 30, 2008 and the date of the loss.

The insurance policy issued by Defendant (hereinafter referred to as "the policy") contained an exclusion of coverage where the insured building was vacant for more than 60 consecutive days before the loss or damage occurs. Specifically, the policy stated:

> d. We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss, if the building where loss or damage occurs has been "vacant" for more than 60 consecutive days before that loss or damage occurs:
> . . .
> (4) Discharge or leakage of water;

(Def's Local Rule 56.1 Statement of Facts., Dkt. No. 53, Ex. I, p. 4.) The terms of the policy indicated that the Property was considered vacant unless at least 31% of its total square footage was "(a) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; or (b) Used by the building owner to conduct customary business

operations." (*Id.* at 39.) Based on Taylor's investigation, Defendant determined that the Property had been vacant for more than 60 days prior to the water leak, and therefore denied coverage for Plaintiffs' claim.

Defendant's decision to deny coverage was based in part on its findings that the Property had no lessees as of late August or early September 2008. The only paying tenants at the Property in 2007 and/or 2008 were Natalie Luce ("Luce"), Robert Burke ("Burke"), Tom Atkins ("Atkins"), Peter Kouzes ("Kouzes"), and a man known only as John. Kouzes entered into a 12-month lease in December 2007, but paid for only two months before breaching the lease in February 2008. Kouzes only entered the building one time when he brought in two ladders. The ladders were left in the building and Kouzes never returned. Atkins leased space at the Property beginning in June 2005 and vacated the premises in June 2007 without leaving any personal or business property. John entered into a 12-month lease, but stayed 13 months at the property before vacating in the Spring or Summer of 2008. Burke leased space to operated a law practice at the Property beginning in 1993. Burke ceased practicing law at the Property on July 1, 2008, and made no further rent payments. Burke left a number of items at the Property, but he retrieved everything but a desk during the Fall of 2008. Luce began operating an orthodontics practice at the Property beginning in 2003. She stopped seeing patients at the property in late August or early September 2008, and her last rent payment was for the month of September 2008.

After September 1, 2008, Plaintiff submits that certain parts of the Property continued to be in use. Burke continued to use several units and the basement for storage of his business property after he ceased practicing law at the Property. Items that remained at the property

3

included client files. Burke retained a key to the property and returned periodically to remove items after July 1, 2008. Wilbourn used the Property as an office and storage space for his other real estate investment properties. Camelback also used units on the first floor, second floor, and in the basement. One second floor unit continued to operate as an office for Camelback, while a first floor unit and the basement were used for storage through the date of the loss.

## III. DISCUSSION

### A. Legal Standards

The parties' cross-motions for summary judgment turn on the question of whether the facts presented by the parties create a genuine issue of material fact as to whether the Property was vacant under the terms of the policy at the time of the loss. A genuine issue of material fact exists when, viewing all evidence in a light most favorable to the non-movant and drawing all justifiable inferences in the non-movant's favor, the court finds that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On cross-motions for summary judgment, the court should consider each movant's motion separately and must "construe all inferences in favor of the party against whom the motion under consideration is made." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998). Because this case is in federal court based on diversity jurisdiction and neither party has challenged the application of Illinois law, the court will apply Illinois substantive law. *Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010).

Insurance contracts should be interpreted to effectuate the intent of the parties based on the language of the contract. *Nicor, Inc. v. Assoc. Elec. & Gas Ins. Servs. Ltd.*, 223 Ill.2d 407, 307 Ill.Dec. 626, 860 N.E.2d 280, 285-86 (2006). Where the terms of the contract are clear, they

4

should be assigned their plain and ordinary meaning. *McKinney v. Allstate Ins. Co.*, 188 Ill.2d 493, 722 N.E.2d 1125, 1127 (Ill. 1999). The court should not "strain to find ambiguity in an insurance policy where none exists." *Id.* (citing *United States Fire Insurance Co. v. Schnackenberg*, 88 Ill.2d 1, 57 Ill.Dec. 840, 429 N.E.2d 1203, 1205 (Ill. 1981)). Where the court finds there to be ambiguity in the contract, it should be construed against the insurer who drafted the policy. *Id.* This is especially true in the context of insurance provisions that limit or exclude coverage, where Illinois courts have interpreted such provisions liberally in favor of the insured. *Coleman Cable, Inc. v. Travelers Indem. Co.*, 2011 WL 1838685, *13 (N.D. Ill. May 13, 2011)(citing *American States Ins. Co. v. Koloms*, 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 75 (Ill.1997)).

Where cross-motions for summary judgment are filed, each party must establish the existence of elements essential to its case, and on which each party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456 (7th Cir. 1997). If the non-moving party fails to at least create a question of material fact as to an essential element of its claim, then all other facts become immaterial and the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323. In this case, both parties would have burdens of proof at trial. Plaintiffs would have to show they were entitled to coverage for the loss, while Defendant would have to establish the applicability of its affirmative defense that Plaintiffs triggered the vacancy exclusion in the insurance policy. *See Santaella*, 123 F.3d at 461.

B. Plaintiff's Motion for Summary Judgment

Plaintiffs describe the Property as containing multiple units, common areas, and a basement, totaling 6,002.41 square feet. The two floors contain 1,985.77 square feet of rentable space and 706.4 square feet of common area. The basement has a total of 310.24 square feet. For the 60 day period prior to the loss, Plaintiffs contend a number of different spaces in the Property were in use. According to Plaintiffs, Burke continued to use the Property to store certain business property after he moved his law practice elsewhere. Plaintiff Wilbourn used the property as an office and storage space in relation to his own personal real estate investments. Camelback made use of a space on the second floor as an office, and used a unit on the first floor and the entire basement for storage. In considering Plaintiff's motion for summary judgment, the court will construe the facts in a light most favorable to Defendant.

Plaintiffs argue that the building was not vacant based on the usage of the Property between October 19, 2008 and the loss on December 19, 2008. Plaintiffs argue that the term "vacant" in the insurance policy is ambiguous, and should therefore be defined as it has been by Illinois courts in analogous situations. This argument is misplaced. The insurance policy in this case clearly and unambiguously defines the term "vacant" to mean that less than 31% of the Property is being "(a) [r]ented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; or (b) [u]sed by the building owner to conduct customary business operations" for any 60 consecutive day period of time. *See Heartland Capital Investments, Inc. v. Grange Mut. Cas. Co.*, 2010 WL 432333 (C.D. Ill. Feb. 2, 2010) (finding a nearly identical definition of vacant in an insurance policy to be clear and unambiguous). Considerations as to what parts of the Property should be considered when calculating the percentage of square footage in use will be limited by the definition of "vacant" in the insurance

6

policy.

Plaintiffs argue Burke continued to use the Property to conduct customary business operations by way of the items he left at the Property after he moved his law practice out and ceased paying rent. The parties are at odds, and the record appears somewhat unclear, as to what items of business or personal property Burke left at the building, and when he retrieved them. Plaintiff argues that Burke retained a key to the property, periodically returned to move items, and "could have" been removing items as late as October through December of 2008. Among the items Burke could have been removing were client files, the storage of which Plaintiff believes constitutes "customary business operations." Though Burke's testimony was that he did leave some items at the Property into the Fall of 2008, his deposition testimony and the evidence in the record does not support a finding that Burke continued customary business operations. Moreover, the policy requires the space to be "rented to a lessee *and* used by the lessee ... to conduct customary business operations" (emphasis added). Burke's testimony was that he sent a letter to Plaintiffs indicating that he would move out as of July 1, 2008, and that he stopped paying rent as of that date. Based on this testimony, it is evident that the unit was no longer "rented" to Burke, and that he was no longer a "lessee" as of July 1, 2008. Therefore, the space being used by Burke should not be included in any calculation of the percentage of square footage in use at the Property.

As to the space being used by Plaintiff Wilbourn, Plaintiffs describe it as being the same space that was being used by Plaintiff Camelback. This description renders Wilbourn's use of the building irrelevant for the purposes of calculating the square footage being used. In addition, Plaintiffs have provided no evidence that Wilbourn was a lessee to Camelback, and therefore,

7

that he would be included as a user of the property under the insurance policy. The court will not consider Wilbourn's use of the property in making a determination about the percentage of the building being used.

The remaining question, then, is whether Camelback, as the owner of the building, was using at least 31% of the property to conduct customary business operations. Plaintiffs contend Camelback was using a 356.5 square foot unit on the second floor as an office, and a 352.5 square foot first floor office for storage of construction supplies and materials. Plaintiffs also claim Camelback used the 310.24 square foot basement for storage, along with all 706.4 square feet of common area on the first and second floors, respectively. In total, Camelback calculates that it was using 2432.04 square feet out of a possible 5,694.58 square feet[1], resulting in 42.7% of the building being used for Camelback's customary business operations.

Defendant believes that Camelback's use of the building cannot be categorized as conducting customary business operations. Defendant also notes that Plaintiffs have failed to provide any evidence, affidavits, or deposition testimony indicating that all or even some of the common areas in the building were used for conducting customary business operations. If this is true, then only 1,019.24 square feet, or 17.9 %[2] of the building, was not vacant for the 60 days preceding the loss.

Lantz's deposition and Plaintiffs' statement of facts indicate that Camelback serviced the

---

[1]Plaintiffs' Local Rule 56.1 Statement of Facts states that the building is 6,002.41 square feet, but all other evidence, exhibits, and mathematical calculations indicate that the building contains a total of 5,694.58 square feet. Plaintiffs reference the 5,694.58 figure in their Response in Opposition to Defendant's Motion for Summary Judgment. The court assumes this number to be correct.

[2]356.5 (2nd Fl. Unit) + 352.5 (1st Fl. Unit) + 310.24 (Basement) / 5,694.58 = .179

8

Property weekly, kept the electricity and water to the building turned on, and kept the two second floor furnaces at the Property running between 67 and 70 degrees. Camelback made upgrades to the building prior to the Loss, including new flooring in January or February of 2008, new paint and light fixtures in 2007 or 2008, and landscaping improvements that were maintained on a yearly basis. (Wilbourn Dep., Pl. S.O.F., Ex. A, p. 20-21.) Wilbourn was in charge of the leasing and day-to-day actions at the building, though Wilbourn testified that he did not visit the property often after September, 2008. (Wilbourn Dep., pp. 12-13, 30, 45.) Plaintiffs used the common areas to service the Property and as a means of ingress and egress to the first and second floor units being used by Camelback. (Lantz Dep., Pl. S.O.F., Ex. B, p. 62.)

The court must determine whether Plaintiffs' purported use of the building constituted customary business operations. "Customary business operations" is not defined in the policy, so the court will look to the intent of the policy based on the language of the contract. The declarations page of the insurance policy at issue indicates that the Property was listed as an office for the purpose of occupancy. The context of the insurance contract at the time it was entered into would have created a reasonable expectation by both parties that building was being insured as an office building, and that Plaintiffs or their lessees would conduct operations customary for an office building. *See Keren Habinyon Hachudosh D'Rabeinu Yoel of Satmar BP v. Philadelphia Indemnity Ins. Co.*, 2011 WL 891347, at *3 (E.D.N.Y. Mar. 11, 2011) (applying a nearly identical vacancy exclusion where the insurance contract was entered into while the building was operating as a school, but was being used for storage and occasional meetings at the time of the loss); *Saiz v. Charter Oak Fire Ins. Co.*, 299 Fed. Appx. 836, 840 (10th Cir. 2008) (finding that continued use of a building for office space did not constitute

9

customary operations where building was insured as a restaurant).

Defendant argues that Plaintiffs customary business operation was in "leasing the Property's commercial units to paying commercial tenants." (Wilbourn Dep., p. 13.) The portion of Wilbourn's testimony relied upon by Defendant was in reference to Camelback's reasons for *purchasing* the Property. Wilbourn also testified that Plaintiffs intended to improve and sell the property to make money. (Wilbourn Dep. 49.) Defendant reads into the policy a requirement that Plaintiffs' customary business operations are limited to those operations required to fulfill the reasons for purchasing the Property. A plain reading of the vacancy clause does not support such a requirement. The clause simply states that the property must be "used by the building owner to conduct customary business operations." Camelback Properties was formed for the purpose of investing in real estate and gaining streams of income based on the real estate. (Wilbourn Dep., pp. 11-12.) The Property was insured as an office building, and deposition testimony shows that Camelback used a second floor unit at the Property as an office to conduct some business at times. This scenario differs from the *Saiz* case, where the court found that the operation of a small office in a building insured as a restaurant did not constitute customary operations. *Saiz*, 299 Fed. Appx. at 840. A reasonable reading of the policy indicates that Camelback's alleged use of office space at the Property for its real estate activities constituted customary business operations at the Property.

The first floor unit used for storage is a trickier question. Wilbourn, Lantz, and Burke testified that a first floor unit was used for storage of items used to perform work on Camelback's properties. (Burke Dep., Pl. S.O.F., Ex. C., pp. 33-35; Wilbourn Dep., pp. 57-61; Lantz Dep., pp. 49, 54-56.) It is not clear as a matter of law whether the storage of building

materials in an office space would constitute customary business operations. Some courts have rejected the contention that items remaining in storage at a building constitute customary operations relative to a vacancy clause in an insurance contract. *See Cameron v. Frances Slocum Bank & Trust Co.*, 824 F.2d 570, Fn. 2 (7th Cir. 1987); *Keren Habinyon*, 2011 WL 891347 at *3; *Hollis v. Travelers Indem. Co. of Conn.*, 2010 WL 1050991, at *9 (W.D. Tenn. Mar. 19, 2010) (unwanted property left by lessee at a property was not counted toward square footage being used for customary operations). The purpose of the vacancy provision is to exclude coverage from buildings that become a higher insurance risk once they become unoccupied. *Heartland*, 2010 WL 432333 at *4. Plaintiffs do not present any information that would indicate they personally accessed or attended to the first floor unit at any time during the 60 day period prior to the loss. Defendants presumably believe that the storage of items in an otherwise unoccupied unit in an office building would carry the same increased risk as a completely vacant unit, and would therefore seek to limit coverage. Drawing all justifiable inferences in favor of Defendant, the court finds that Defendant may not have bargained for this type of coverage when it chose to insure an office building. Camelback's has not demonstrated for the purpose of a motion for summary judgment that use of the first floor unit for storage of left-over construction and building materials constituted customary business operations under the terms of the insurance policy.

Plaintiffs also assert that the entirety of the common areas and the basement should be considered in determining the amount of the Property being used for customary business operations. As to the basement, the court finds no factual or evidentiary support in any of Plaintiffs' materials for the proposition that Camelback used the basement for customary

11

business operations. Plaintiffs' statement of facts provides no citation to any factual support regarding Camelback's use of the basement. The only information Plaintiffs present as to the basement is that it was used by Burke to store items. As the court has already dispensed with the claim that Burke was a tenant, there is no information in the record that would allow the court to find that the basement was not vacant at any point during the 60 day period prior to the loss.

As to the common areas, it is clear they would have been used to get to the second floor unit used by Camelback as an office. Plaintiffs argue that the common areas had to be used for ingress and egress, and to service other parts of the Property. Defendant essentially excludes the common areas from all of its calculations, but provides no affirmative evidence that the common areas were not used during the 60 days preceding the loss.

If the court were to find that the entire common areas on the first and second floors and the second floor unit were used by Camelback for customary business operations during the 60 day period prior to the loss, approximately 31% of the Property's square footage would be found not vacant.[3] It would therefore be an essential element of Defendant's affirmative defense to show that the common areas, or some portion of the common areas, were not used for customary business operations during this period. Relying on the dimensions of the common areas and the need to use them for ingress and egress, Plaintiff includes the entire common area of the Property in its calculations as to the amount of square footage that was used in conjunction with Camelback's use of office space. Defendant's response largely ignores the common areas, though at one point it uses a figure of 268.4 square feet in a calculation without any further

---

[3] 706.4 (common area) + 706.4 (common area) + 356.5 (2nd floor unit) / 5,694.58 (total sq. foot.) = .3106 (31.06%)

explanation. (Def. Resp., Dkt. No. 65, p. 14.)

There is simply not enough information in the record for the court to make a determination as to whether the common areas were used for customary business operations. It is not clear what types of activities would constitute the customary business operations of Camelback in the context of the common areas of the Property. Even if it were clear, a number of factual questions remain regarding the use of the common areas. How often were Camelback employees in the common areas? What parts did they access and use? Was maintenance performed on the common areas? If so, by whom? Did anyone use the restrooms or closets during the 60 day window? Was any public access allowed in the common areas and did anyone other than Lantz or Wilbourn use the common areas after the renters vacated? Were prospective tenants or buyers shown around the Property during that time? The court presumes that such questions could be answered at trial, but a factual dispute remains as to whether the common areas at the Property were being used by Camelback for customary business operations at any point between October 19, 2008 and December 19, 2008 for the purposes of the parties' motions for summary judgment. Because the common areas are a crucial element in determining whether 31 percent of the Property was in use at any point during the 60 day window preceding the loss, Plaintiffs' motion for summary judgment is denied.

## C. Defendant's Motion for Summary Judgment

For the purposes of considering Defendant's motion for summary judgment, the court incorporates its description of the evidence from its discussion of Plaintiffs' motion for summary judgment. In considering Defendant's motion for summary judgment, the court views all evidence in a light most favorable to Plaintiffs and draws all justifiable inferences in the

Plaintiffs' favor.

The court finds there to be no genuine issue of material fact as to whether any of the tenants at the Property remained as lessees between October 19, 2008 and December 19, 2008. The court finds the language from the insurance contract to be clear and unambiguous. The remaining question is whether, when viewing the facts in a light most favorable to Plaintiffs, there remains genuine issues of material fact such that a reasonable jury could find that Camelback engaged in customary business operations as owner of the Property within the 60-day window prior to the loss.

The court again finds that none of Plaintiffs' previous tenants fall under the definitions of the insurance contract such that the rental units they inhabited should be counted toward the total square footage of the building that were in use for the 60 days period prior to the loss. Similarly, the court finds there to be insufficient evidence to support a finding that the basement was being used for customary business operations. The key question is whether Camelback used all or nearly all square footage in a first floor unit, a second floor unit, and the common areas.

As to the second floor unit, the court refers to its discussion from Plaintiffs' motion for summary judgment. Both Plaintiffs and at least one former tenant testified at depositions that Camelback made use of a unit on the second floor to conduct customary business operations. Viewing this evidence in a light most favorable to Plaintiffs, the court finds there to be a genuine issue of material fact as to whether the second floor unit could be considered vacant for the 60 day period prior to the loss.

As to the first floor unit, the parties do not dispute that various items were stored in the unit in connection with Camelback's use of the property. They are at issue as to whether the

14

storage of the construction materials constitutes customary business activity for the purposes of the policy. The court discussed this question when addressing Plaintiff's motion for summary judgment, but now revisits the question while viewing all facts an inferences in a light most favorable to Plaintiffs. Plaintiffs state that the items stored in the first floor unit, including flooring materials, paint cans, old lights, and miscellaneous construction supplies and materials, were used to remodel and maintain the Property up to and through the date of the loss. The record reveals that Plaintiffs had been using the first floor unit to store building-related materials for a significant period of time, though the record is devoid of any information indicating that the materials were used, or that the first floor unit was ever accessed, during the 60 day period prior to the loss. Nevertheless, Plaintiffs would presumably argue that the act of storing materials in the first floor unit was a part of the ongoing business operations carried out by Camelback in the second floor unit. The parties may have entered into the insurance contract with the expectation that the storage of materials is a potential way to use office space. Drawing this inference in favor of Plaintiffs, it is possible a reasonable jury could find the first floor unit was not vacant under the terms of the policy.

The first and second floor units used by Camelback comprise only 12.5 percent of the total square footage at the Property. The common areas alone represent nearly 25 percent of the total square footage at the Property.[4] Based on the court's findings as to the other parts of the Property, any ruling that at least 31 percent of the Property was used at some point during the 60 day period prior to the loss would necessarily be premised on a finding that at least three-

---

[4] 706.4 (common area) + 706.4 (common area) / 5,694.58 = .2481 (24.81 %)

quarters of all common areas were used for customary business operations.[5]

Plaintiffs cite to a statement from Lantz's deposition that Camelback serviced the building every week and used the common areas to do so. (Lantz Dep., p. 62.) Plaintiffs' arguments presuppose that Camelback used every square foot of the common areas for servicing of the building and/or ingress and egress. Plaintiffs also assert that the use of the entire common areas for building maintenance continued after the Property was vacant of all renters other than Camelback. Specifically, Plaintiffs' Reply Brief references the use of the common areas to make certain upgrades to the building "immediately prior to the water damage." A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record. FED. R. CIV. P. 56(c)(1). The court must consider only the cited material, which, in this case, is one general statement about the use of the common areas without any indication as to the amount in use or the time in which it was used. FED. R. CIV. P. 56(c)(1).

Though the court need only consider the cited material, it may consider other materials in the record in relation to Lantz's statement about the common areas. FED. R. CIV. P. 56(c)(1). Lantz testified that it was Wilbourn who went to the building on a day-to-day basis, and that he never saw Luce at the building after she wrote a letter indicating that she intended to end her tenancy because he "didn't go to the building every day." (Lantz Dep. P. 24, 63.) As to the building upgrades, Wilbourn described upgrades to the Property that took place in January or February of 2008. (Wilbourn Dep., p. 22.) Wilbourn described other upgrades such as painting or replacing lighting fixtures as generally having taken place in 2007 and 2008. (Wilbourn Dep.,

---

[5] 356.5 (2nd floor unit) + 352.5 (1st floor unit) + 1,059.6 (3/4 of common area) / 5,694.58 = .3105 (31.05 %)

p. 22-23.) Wilbourn testified on four occasions during his deposition that he did not visit the building very often after September 2008. *Supra* at 9. Plaintiffs' statement of facts indicates that the furnaces servicing the first floor had been turned down to 55 degrees. (Pl. S.O.F., ¶ 10.) Wilbourn testified that he set the heat in the building at 55 degrees because the building was vacant. (Wilbourn Dep., p. 64.) Taylor's electronic file note reflecting her conversation with Wilbourn ten days after the loss indicates that Wilbourn told her the building had been vacant for four months. (Taylor Dep., Pl. S.O.F., Ex. F, p. 31.) The above evidence raises material questions about the testimony relied upon by Plaintiffs when arguing how and when the common areas were being used for customary business operations.

As discussed, *supra*, the record is simply unclear, and the parties are at issue, as to the extent and nature of Plaintiffs' use of the common areas during the 60 days preceding the loss. Plaintiffs have pointed to testimony indicating that the common areas were used in connection with Camelback's use of the property. Defendant argues the evidence in the record relating to Camelback's scarce use of the property once the tenants vacated would prevent a trier of fact from finding for Plaintiffs. The court finds there to be questions of fact on this material issue that must be decided by a trier of fact. Therefore, Defendant's motion for summary judgment must be denied.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment and Defendant's motion for summary judgment are denied without prejudice.

ENTER: *[signature]*
_____
P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: January 6, 2012